## Case No. 23-10691

*In the*

# United States Court of Appeals

*for the*

# Eleventh Circuit

---

DAVID EFRON,
*Plaintiff-Appellant,*

v.

MADELEINE CANDELARIO
and MICHELLE PIRALLO DI CRISTINA,
*Defendants-Appellees.*

---

*On Appeal from the United States District Court for the Southern District of Florida,*
*District Court Case No. 1:22-cv-21452-Martinez · Honorable Jose E. Martinez, U.S. District Judge*
*Honorable Jacqueline Becerra, U.S. Magistrate Judge*

## INITIAL BRIEF OF APPELLANT DAVID EFRON

CHARLES M. AUSLANDER
JOHN G. CRABTREE
BRIAN C. TACKENBERG
**CRABTREE & AUSLANDER**
240 Crandon Boulevard, Suite 101
Key Biscayne, Florida 33149
Telephone: (305) 361-3770
jcrabtree@crabtreelaw.com
causlander@crabtreelaw.com
btackenberg@crabtreelaw.com

BENEDICT P. KUEHNE
**KUEHNE DAVIS LAW, P.A.**
Miami Tower, Suite 3105
100 S.E. 2nd Street, Suite 3105
Miami, Florida 33131-2154
Telephone: (305) 789-5989
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com

*Attorney for Appellant David Efron*

 

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Eleventh Circuit Rule 26.1-1, appellant certifies the following persons and entities may have an interest in this case:

1. Aponte, Nestor

2. Aponte Hernandez, Jorge

3. Auslander, Charles M. (counsel for Appellant)

4. Becerra, Hon. Jacqueline, U.S. Magistrate Judge

5. Coffey, Kendall (counsel for Plaintiff)

6. Coffey Burlington, L.P.

7. Cordero, Charles

8. Crabtree, John (counsel for Appellant)

9. Crabtree & Auslander, LLC

10. Davis, Michael T. (counsel for Appellant)

11. Dmitrovsky, Susan (counsel for Appellant)

12. Dos Santos, Johan (counsel for Appellant)

13. Efron, David (Plaintiff/Appellant)

14. Hiassen, Scott (counsel for Plaintiff)

15. Kuehne, Benedict P. (counsel for Appellant)

16. Kuehne Davis Law, P.A.

17. Lage, Gustavo D. (counsel for Appellee)

18. Martinez, Hon. Jose E., U.S. District Judge

19. Sanchez-Medina, Gonzalez, Quesada, Lage, Gomez and Machado, LLP

20. Saper, Adam C. (appeared as counsel for Plaintiff)

21. Tackenberg, Brian C. (counsel for Appellant)

<u>11th Cir. R. 26.1-3 Certification</u>: No publicly traded company or corporation has an interest in the outcome of this appeal.

Dated: June 26, 2023

Respectfully submitted,

*/s/ Charles M. Auslander*
Charles M. Auslander
Florida Bar No. 349747
Crabtree & Auslander
240 Crandon Boulevard, Suite 101
Key Biscayne, Florida 33149
Tel: (305) 361-3770
causlander@crabtreelaw.com

*Counsel for Appellant David Efron*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would benefit the Court in light of the complexities associated with the district court's erroneous application of the *Rooker-Feldman* doctrine to claims derived from the intentional corruption of state-court proceedings. Additionally, the conflicting developments and application of the doctrine among the circuits warrants the grant of oral argument in the interests of justice.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ..................C-1

Statement Regarding Oral Argument .......................................................... i

Table of Authorities................................................................................v

Statement of Subject Matter and Appellate Jurisdiction ...............................................x

Statement of the Issues .......................................................................... 1

Statement of the Case .......................................................................... 2

      I.     Course of Proceedings and Disposition in the District Court .............. 2

           A.     Introduction .................................................................. 2

           B.     Course of proceedings .................................................... 3

           C.     Disposition by the district court .................................... 4

      II.    Statement of the Facts.......................................................... 7

Standard of Review ............................................................................ 12

Summary of the Argument .................................................................... 13

Argument ........................................................................................ 15

      I.     The district court reversibly erred in holding that it lacked jurisdiction under the *Rooker-Feldman* doctrine: the Complaint sought only money damages against the Defendants for their intentional corruption of state-court proceedings that violated Plaintiff's fundamental right to due process and civil rights, and the Plaintiff sought no relief that would overturn the state-court judgment ........................................................................... 15

A.    The district court's dismissal order misapprehended the law that should have been applied when it failed to consider the profound limitations recognized on the scope of the *Rooker-Feldman* doctrine in *Behr v. Campbell*, 8 F. 4th 1206 (11th Cir. 2021) .................................................................................. 15

B.    As a direct consequence of its misunderstanding of the limited constraint *Rooker-Feldman* imposes on subject matter jurisdiction, the district court misapplied the law to dismiss all of Efron's claims for lack of subject matter jurisdiction............. 18

    1.    The district court did not apply the correct law .............. 18

    2.    The district court did not accept the allegations of the Complaint as true: the court instead derided those allegations and suggested they were false—characterizing them as Efron's seeking his "pound of flesh" and comparing them to a fictionalized dramatic telenovela... 21

    3.    Viewing the allegations in their most favorable light, the Complaint readily states a basis for federal subject matter jurisdiction by demanding damages for the actions of the Defendants...................................................................... 26

    4.    The district court's dismissal order is not supported by any post-*Exxon Mobil* decision of this Court ........................ 31

    5.    The proper application of *Rooker-Feldman* post-*Behr* requires reinstatement of the Complaint......................... 33

II.    The Court should recognize an exception to the *Rooker-Feldman* doctrine when a plaintiff alleges that extrinsic fraud has so corrupted state-court proceedings that the plaintiff was denied a neutral and detached state tribunal, and the plaintiff seeks only damages—not an overturning of the state-court judgment................................................ 34

A.    No published decision of this circuit has decided whether to apply a fraud exception to *Rooker-Feldman* ....................................... 34

iii

B.     A majority of the federal circuits recognize that a plaintiff has federal subject matter jurisdiction to sue for damages based on the independent wrongdoing of participants in state court proceeding where the plaintiff does not seek to overturn the state court judgment ................................................................................. 38

C.     The Seventh Circuit reverses course and rejects its previously confirmed "corruption exception" to *Rooker-Feldman* ............ 40

Conclusion ........................................................................................... 44

Certificate of Compliance ..................................................................... 45

Certificate of Service ............................................................................ 46

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages**

*Arthur v. JP Morgan Chase Bank, NA,*
   569 Fed. Appx. 669 (11th Cir. 2014)........................................................ 26-27

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................................. 31

*Athens Newspapers, Inc. v. Jefferson Standard Life Ins. Co.,*
   729 F.2d 1412 (11th Cir. 1984)................................................................. 29

*Bailey v. Janssen Pharm., Inc.,*
   288 Fed. Appx. 597 (11th Cir. 2008).......................................................... 29

*Behr v. Campbell*
   8 F.4th 1206 (11th Cir. 2021) ............................................................. *passim*

*Bloch v. Frischholz,*
   533 F.3d 562, (7th Cir. 2008) (Wood, dissenting),
   *reversed in part,* 587 F.3d 771 (7th Cir. 2009) (en banc) ............................... 23

*Bonilla v. Baker Constr., Inc.,*
   487 F.3d 1340 (11th Cir. 2007)................................................................. 35

*Carmichael v. Kellogg, Brown & Root Services, Inc.,*
   572 F.3d 1271(11th Cir. 2009)................................................................. 12

*Casale v. Tillman,*
   558 F.3d 1258 (11th Cir. 2009).......................................................... 31, 32

*Chambers v. Thompson,*
   150 F.3d 1324 (11th Cir. 1998)................................................................. 19

*Chevaldina v. Katz,* 21-12455,
   2022 WL 2568066 (11th Cir. July 8, 2023)............................................. 21, 25

*Davis v. Ruby Foods,*
   269 F.3d 818 (7th Cir. 2001)................................................................... 29

*D.C. Court of Appeals v. Feldman,*
    460 U.S. 462 (1983) ................................................................. 2

*Del Castillo v. Fla. Dep't of Health,*
    26 F.4th 1214 (11th Cir. 2022) ...................................... 19

*Efron v. Moral Candelario,*
    No. K AC 2001-4173, 2008 WL 5941795
    (Puerto Rico Ct. App., Oct. 29, 2008) ............................ 22

*Exxon-Mobil Corp. v. Saudi Basic Indus. Corp.,*
    544 U.S. 280 (2005) ................................................. *passim*

*Federación de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo*
    *de Puerto Rico,*
    410 F.3d 17 (1st Cir. 2005) ............................................ 2

*Ferrier v. Cascade Falls Condo. Ass'n, Inc.,*
    820 Fed. Appx. 911 (11th Cir. 2020)................................ 32-33, 37

*Goodman ex rel. Goodman v. Sipos,*
    259 F.3d 1327 (11th Cir. 2001).................................. 19, 32

*Great Western Mining & Mineral Co. v. Fox Rothschild LLP,*
    615 F.3d 159 (3d Cir. 2010)........................................ 38-39

*Guy v. Florida,*
    No. 19-12852, 2022 WL 111278 (11th Cir. April 14, 2022) ......................... 34

*Hadzi-Tanovic v. Johnson,*
    62 F.4th 394 (7th Cir. 2023) .................................... 40-43

*Hill v. White,*
    321 F.3d 1334 (11th Cir. 2003).................................... 12

*Kohler v. Garlets,*
    578 Fed. Appx. 862 (11th Cir. 2014)..............................36

*Kougasian v. TMSL, Inc.,*
    359 F.3d 1136 (9th Cir. 2004)...................................... 39

*Lawrence v. Dunbar*,
  919 F.2d 1525 (11th Cir. 1990)........................................................ 8, 21, 25, 31

*Lozman v. City of Riviera Beach*,
  713 F.3d 1066 (11th Cir. 2013)........................................................ 12

*Maradiaga v. United States*,
  679 F.3d 1286 (11th Cir. 2012)........................................................ 12, 29

*McCormick v. Braverman*,
  451 F.3d 382 (6th Cir. 2006) .......................................................... 36, 39

*Miccosukee Tribe of Indians v. U.S. Army Corp. of Eng'rs*,
  619 F.3d 1289 (11th Cir. 2010)........................................................ 12

*Mizell v. Wells Fargo Bank, N.A.*,
  No. 22-12119, 2023 WL 355067 (11th Cir. Jan. 23, 2023) .......................... 33

*MSK Eyes Ltd. v. Wells Fargo Bank,Nat. Ass'n*,
  546 F.3d 533 (8th Cir. 2008).......................................................... 42

*Nesses v. Shepard*,
  68 F.3d 1003 (7th Cir. 1995)........................................................... 41

*Nicholson v. Shafe*,
  558 F.3d 1266 (11th  Cir. 2009) ...................................................... 31

*Provitola v. Comer*,
  No. 21-10878, 2022 WL 823582 (11th Cir. March 18, 2022) ...................... 34

*Ray v. McCullogh Payne & Haan, LLC*,
  838 F.3d 1107 (11th Cir. 2016)........................................................ 35

*Resnick v. KrunchCash, LLC*,
  34 F.4th 1028 (11th Cir. 2022) ........................................................ 12, 29

*Rooker v. Fid. Trust Co.*,
  263 U.S. 413 (1923) ...................................................................... 2

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000) (en banc) ........................................... 5, 18, 19

*Tormenia v. LVNV Funding, Inc.*,
    Case No. 8:18-cv-2347-T-23TGW,
    2019 WL 3429591 (M.D. Fla. July 30, 2019) ................................. 23

*Truong v. Bank of Am., N.A.*,
    717 F.3d 377 (5th Cir. 2013) ......................................................... 39

*United States v. Jackson*,
    55 F.4th 846 (11th Cir. 2022) ....................................................... 19

*VanderKodde v. Mary Jane M. Elliott, P.C.*,
    951 F.3d 397 (6th Cir. 2020) ......................................................... 17

*Wilson v. Cook City*,
    937 F.3d 1028 (7th Cir. 2019) ....................................................... 40

## Statutes & Rules

28 U.S.C. § 1258 ...................................................................................... 2

28 U.S.C. § 1291 ...................................................................................... x

28 U.S.C. § 1331 ...................................................................................... x

28 U.S.C. § 1367(a) .................................................................................. x

42 U.S.C. § 1983 ................................................................................ *passim*

Seventh Circuit Rule 40(e) .................................................................... 40

## Additional Authorities

Exploratory Shakespeare, The Merchant of Venice as Nazi Propaganda,
    https://journeys.dartmouth.edu/exploratoryshakespeare/2015/07/14/the-
    merchant-of-venice-as-nazi-propaganda/ ...................................... 22

Olga Segura, "Why telenovelas are a powerful—and problematic—part of Latino culture," https://www.americamagazine.org/arts-culture/2018/04/06/why-telenovelas-are-powerful-and-problematic-part-latino-culture ......................... 24

William Shakespeare, *The Merchant of Venice* .............................................. 5, 22-23

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

This is an appeal from a final order; 28 U.S.C. § 1291 gives the Court jurisdiction to hear it. The underlying subject matter jurisdiction in this case rests on 28 U.S.C. § 1331, which provides for federal question jurisdiction for claims based on 42 U.S.C. § 1983, and 28 U.S.C. § 1367(a), providing supplemental jurisdiction for state law claims forming part of the same case or controversy.

## STATEMENT OF THE ISSUES

Asserting claims under the Civil Rights Act, 42 U.S.C. 1983, and for unjust enrichment, the plaintiff sought damages based on the defendants' intentional corruption of state-court proceedings that violated the plaintiff's civil rights and fundamental right to due process; the Plaintiff did not, however, seek any relief that would overturn the state-court judgment.

The issues on appeal are:

1. Did the *Rooker-Feldman* doctrine bar the district court from exercising jurisdiction over the plaintiff's claims?

2. To the extent the *Rooker-Feldman* doctrine otherwise applies to cases alleging the intentional corruption of state-court proceedings, should the Court recognize an exception to the doctrine when a plaintiff does not seek to overturn a state-court judgment?

## STATEMENT OF THE CASE

### I.    Course of Proceedings and Disposition in the District Court.

### A.    Introduction.

Invoking the *Rooker-Feldman* doctrine,[1] the district court concluded it lacked subject matter jurisdiction and dismissed the plaintiff's Complaint without prejudice. In so ruling, the district court relied principally on superseded jurisprudence of this Court in which the dominating feature was whether a federal complaint was "inextricably intertwined" in substance with an underlying state-court proceeding.

But this Court rejected that approach to jurisdiction-based dismissals in *Behr v. Campbell*, 8 F.4th 1206, 1209 (11th Cir. 2021). The district court thus misapprehended the scope of *Rooker-Feldman* as charging the court with comparing the factual relationship between the plaintiff's allegations and the underlying state-court dispute to see if the two were "inextricably intertwined."[2] This approach is not consistent with this Court's precedent.

The Complaint alleges an independent fraud in the form of an antecedent and

---

[1] *Rooker v. Fid. Trust Co.*, 263 U.S. 413 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

[2] The *Rooker-Feldman* doctrine applies in the same way to the territory of Puerto Rico as it does to the 50 states. *See Federación de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico*, 410 F.3d 17, 21 (1st Cir. 2005); 28 U.S.C. § 1258. So, while fully aware that Puerto Rico is not a state, this brief uses the word "state" as shorthand.

discrete scheme by two defendants that harmed the plaintiff by subverting the neutrality of the state tribunal, and exclusively seeks monetary damages from the defendants as compensation for their past wrongdoing. The Complaint does not, however, directly or indirectly seek to overturn any state court judgment—the principal reason why the Complaint should not have been dismissed.

There is an additional aggravating factor. The district court's opinion of the Complaint was that the plaintiff, David Efron, "seeks his pound of flesh" and alleges a "story fit for adaptation into a telenovela" (29-1)—making painfully clear that the district court disbelieved Efron's factual allegations, rather than taking them as true as required in considering a motion to dismiss. The district court's jurisdictional analysis thus proceeded from disbelief that Efron could have suffered any injury distinct from the state court's judgment, and is thus contrary to the cardinal rule required for evaluation of motions to dismiss.

## B.  Course of Proceedings.

Efron filed a Complaint seeking damages against Defendants Madeleine Candelario and Michelle Pirallo Di Cristina for civil rights violations and conspiracy to deprive Efron of due process under the Fourteenth Amendment in violation of 42 U.S.C. § 1983 and Florida state law. (1-1). Candelario is Efron's former spouse, and Pirallo is her lawyer. (1-3-¶9; 1-4-¶11). They are referred to individually by their names and jointly as "Defendants."

The Complaint details a corrupt scheme in which Candelario and Pirallo, her attorney, engaged two appellate court judges from Puerto Rico to exchange favorable rulings for Candelario's financial benefit, to Efron's detriment. *See, e.g.* (1-1-24-¶¶1-26). That scheme and the resulting, corrupt rulings cost Efron millions of dollars. (*Id.*).

After Efron sued them for damages, Defendants moved to dismiss, arguing that, under *Rooker-Feldman*, the district court did not have subject matter jurisdiction. (11-9, 15-18). The Defendants also raised a statute of limitations defense. (11-18).

## C.  Disposition by the district court.

The district court issued an "Order on Defendants' Motion to Dismiss," that ordered dismissal exclusively on *Rooker-Feldman* grounds. (29-8-12). The district court treated the motion as a facial attack on subject matter jurisdiction: "While Defendants couch their 12(b)(1) motion as a factual attack, the universe of facts upon which the Motion relies is contained in the Complaint and attachments thereto; therefore, the Motion presents a facial attack, and this Court must take the allegations in the Complaint as true." (29-8).[3]

The order dismissed the Complaint without prejudice on *Rooker-Feldman* jurisdictional grounds. (29-11-12). The order relies heavily on *Rooker-Feldman* case

---

[3] Our argument disputes that the district court genuinely accepted the allegations of the Complaint as true: the district court invalidated the legitimacy of Efron's allegations by stating that Efron was pursuing a "pound of flesh" and by comparing his allegations to a telenovela. *See infra.*

law providing that a federal complaint that is "inextricably intertwined" with the underlying state-court proceeding must be dismissed for want of subject matter jurisdiction. (29-9). The dismissal order refers directly to the now-debunked standard for dismissal under *Rooker-Feldman*:

> The doctrine extends not only to constitutional claims presented or adjudicated by a state court, but also to claims that are 'inextricably intertwined' with a state court judgment.

(29-9). The dismissal order quotes *Siegel v. LePore*, 234 F.3d 1163, 1172 (11th Cir. 2000) (en banc), a decision this Court issued five years before *Exxon-Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 125 S. Ct. 1517 (2005). As Efron argues in this brief, this erroneous statement of the law was neither dicta nor harmless.

The district court judgment also characterizes Efron's Complaint as one seeking his "pound of flesh," a direct reference to Shakespeare's *Merchant of Venice*:

> Through this action, Plaintiff seeks what he believes to be his 'pound of flesh' [footnoting "*See* William Shakespeare, *The Merchant of Venice* act 4, sc. 1, 1. 320.] nearly two decades overdue by his account.

(29-1). The district court continues:

> Although lacking Shakespearean refinement, the Complaint tells a story fit for adaptation into a telenovela: [footnoting: A telenovela is a Spanish-language soap opera.] a vast conspiracy to defraud Plaintiff stemming from his divorce proceedings against Defendant Madeleine Candelario (Plaintiff's ex-wife), spanning multiple decades, and involving Ms. Candelario; certain non-party Puerto Rican judges, if not the entire Puerto Rican judiciary; and Defendant Michelle Pirallo Di Cristina, Ms. Candelario's divorce attorney.

(29-1-2).[4]

The dismissal order then summarizes the substance of the Complaint and its exhibits, (29-2-6), emphasizing the very last paragraph (66) of the body of the Complaint, which asserts the following:

> Until Efron's due process rights are restored by the abrogation of the Aponte decision, Candelario and Pirallo will continue to have free reign to use the corrupt orders in that case to enlist the courts of Florida and Puerto Rico as unwitting co-conspirators in their illegal scheme.

(1-16-¶66). In its prayer for relief, the Complaint did not, however, seek to abrogate the Aponte decision; it sought only damages. (1-16-20-¶¶67-94).

The district court's resulting application of the law notably omitted *Behr*:

> After reviewing Plaintiff's claims in the contexts of his factual allegations, this Court finds that all the claims in the Complaint are inextricably intertwined with the validity—or, rather, the alleged invalidity—of the Aponte Opinions both of which were issued in connection with enforcing the finalized divorce decree.

(29-9). The district court highlights the last paragraph in the main body of the Complaint to conclude that Efron's claim is exclusively an effort to abrogate the Aponte opinions, so that Efron "is precisely 'the sort of 'state-court loser[ ] the

---

[4] We note that there is no allegation (nor even *suggestion*) that "the entire Puerto Rican judiciary" schemed against Efron. That, too, is an adornment to the facts originating with the district court—not the pleading. To the contrary, the Complaint alleges that the conspirators served to "enlist the courts of Florida and Puerto Rico as unwitting co-conspirators in their illegal scheme." (1-16-66). The allegations of the Complaint assert only that Judges Cordero and Aponte were witting members of the conspiracy. (1-16-¶¶ 31-32).

*Rooker-Feldman* doctrine was designed to turn aside' as granting Plaintiff relief in this action would necessarily require this Court 'effectively nullify[ing]' the Aponte Opinions." (29-10).

The dismissal order then reasons that Efron seeks to apply the "fraud exception" to *Rooker-Feldman* but concludes that—unlike other circuits—this Court has not adopted that exception. (29-10-11). The district court added that the monetary relief sought in actual damages is "rooted in the Aponte Opinions," such that granting relief would necessitate a determination "that the Aponte Opinions were entered in error." (29-11).

Separately, the district court concluded Efron "had a reasonable opportunity to raise their [sic] claim in the state-court proceeding, especially considering the Aponte Opinions were entered approaching two decades ago." (29-11). The district court dismissed the case for lack of subject-matter jurisdiction, expressly determining that in light of that ruling it need not reach the other issues raised by the motion to dismiss. (29-11-12).

Efron timely appealed. (33-1).

## II.    Statement of the Facts.

The allegations in Efron's Complaint are the only facts in this record. The following discussion of the Complaint's allegations should be taken as true in light of the governing legal standard that applies to facial attacks on subject matter jurisdiction.

*Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).

Efron is a successful lawyer in Puerto Rico who has been embroiled before the courts of that territory in a dispute with Candelario centered on the distribution of marital property. (1-2-¶20). Candelario engaged two Puerto Rican appellate court judges, Nestor Aponte and Charles Cordero, in a scheme to defraud Efron. (1-10-¶38; 46 et seq.). This corrupt scheme was complicated, nearly untraceable, and operated for years, during which time Efron unjustly paid millions to Candelario, his ex-spouse and Cordero's then-girlfriend. (1-12-14-¶¶46-55).

Candelario's attorney joined in the scheme by actively filing motions and briefs on behalf of her client in the trial and appellate courts of Puerto Rico. (1-12-¶47; 1-13-¶50). The goal of these filings was to establish a predicate on appeal for Judge Aponte to vacate the valid, state-court limitations on Candelario's recovery against Efron, and subsequently to file appellate briefs that would allow Judge Aponte not only to vacate the lower court judgment but to authorize Candelario to collect much greater sums from Efron, which, according to the Complaint, she continues to do to this day. (1-13-14-¶¶50-55).

This *quid pro quo* scheme hatched by the Defendants was a plan to exchange favorable appellate rulings for the mutual benefit of the Defendants. (1-3-¶10). The scheme worked like this: Judge Aponte sought a ruling from Judge Cordero that would aid Judge Aponte's brother, a man facing indictment in Puerto Rico for his role in a

public corruption scandal. (1-4-5-¶¶12-16). Judge Cordero's motivation was far simpler: to enrich his girlfriend-partner Candelario—Efron's former wife. (1-3-¶10; 1-14-¶54). Efron was the financial victim of this scheme. (1-6-¶22).

In greater detail, Judge Cordero would cause his appellate panel to reverse a Puerto Rico trial court and to issue favorable rulings for Aponte's criminally indicted brother. (1-4-5-¶12-16). In return, Judge Aponte would author an appellate decision reversing favorable rulings for Efron in the trial court's dissolution proceedings. (1-5-6-¶¶17-21). That would, in turn, provide the jumping-off point to funnel, to date, approximately $7 million from Efron to Candelario. (1-12-14-¶¶46-55).

These events were well-timed by the conspirators. As for Aponte, he appeared to be headed to trial on the indictment against him, after a state appellate panel denied his petition to dismiss the charges against him in March 2004. (1-12-¶12; 1-6-Ex. 5). But Aponte's second appeal from a subsequent denial of a motion to dismiss the charges was assigned to Judge Cordero's panel. (1-4-¶¶13-15). This time, Aponte got precisely what he needed, in the form of an appellate decision just months later in January 2005, which commanded the state prosecutor to modify the indictment in a manner favorable to Aponte, stating that the prosecution had exceeded its authority, "by inserting extraneous and legally improper elements of judgment in relation to the crime charged." (1-7-13, Ex. 6).

As the complaint alleges, the scheme was a success: Judge Aponte's brother is

free, having escaped criminal prosecution. (1-6-¶22).

But importantly, as the Complaint specifies, only days after Aponte won before Judge Cordero's panel, Candelario's attorney Pirallo swung into action by filing a motion in the trial court demanding a $50,000 monthly "advance" on her share of allegedly undetermined marital assets from her former marriage to Efron. (1-5-¶17). The trial court ruled against Candelario in March 2005, but the intended goal was served as the stage was set for an appeal that would come before Judge Aponte. (*Id.*; 1-8-2; Ex. 7).

In January 2006, Judge Aponte followed through with his part of the bargain, authoring an opinion that vacated the trial court's order denying Candelario's request. (1-6-¶20). He wrote an opinion that dramatically increased Candelario's provisional advance on the asset distribution, by ordering Efron to pay $50,000 per month retroactive to 2001, which obliterated the legal effect of the Florida decree. (1-8-10). Judge Aponte then issued a second opinion in February 2006, this time ordering Efron to pay interest that had accrued retroactively to 2001 (on this revised judgment). (1-6-¶21; 1-6-Ex. 8).

Candelario and Pirallo obtained an opinion that has allowed them to transmogrify a capped $750,000 dissolution payment issued by the Florida court then effectively given comity by the Puerto Rico trial court (1-6-¶¶20-22; 1-7-¶¶40-44), into a bonanza in which they have, so far, secured approximately $7 million from Efron.

10

(1-7-¶22).

The Complaint further pled that seeking reconsideration of this appellate ruling would be futile, there being no mechanism to inject evidence of Judge Aponte's corruption into an appellate record.  (1-14-¶58). Efron, who had been forced to litigate an appeal when the decision had already been decided before the first brief was even filed, can do nothing to change the further course of the proceedings before the lower tribunals. (1-14-15-¶¶57-58).

The relief expressly sought by the Complaint was joint and several liability for damages against Candelario and Pirallo, including attorneys' fees and costs, as well as punitive damages. (1-7-¶24). No relief was sought against Puerto Rican judges Aponte and Cordero. No request was made in any of the four counts of the Complaint to reverse or vacate the appellate decision of the Puerto Rico court. (1-16-20-¶¶67-94).

Indeed, the Complaint's allegations are heavily skewed to explaining in detail the upending of the finality of the property distribution case between Efron and Candelario, who seeks to garnish $50,000 per month from Efron in perpetuity. (1-14-¶55). Asset attachments continue to this day, with total collections by Candelario approximating $7 million. (1-15-¶59). At the time they were divorced, the marital estate was valued at under $2 million, half of which would have belonged to Efron. (1-16-¶64). Thus, Efron alleges that the Candelario scheme has netted her over $6 million in excess of her legitimate dissolution distribution. (*Id*). Candelario last filed

a motion to jail Efron for contempt. (1-16-¶65).

## STANDARD OF REVIEW

The same standard of review applies to both issues raised on appeal.

Review of the legal application of the *Rooker-Feldman* doctrine is *de novo. Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1069 (11th Cir. 2013).

"A dismissal 'for lack of subject matter jurisdiction presents a legal question that we review *de novo.*' *Miccosukee Tribe of Indians v. U.S. Army Corps of Eng'rs,* 619 F.3d 1289, 1296 (11th Cir. 2010). We 'accept[ ] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff.' *Hill v. White,* 321 F.3d 1334, 1335 (11th Cir.2003)." *Maradiaga v. United States*, 679 F.3d 1286, 1291 (11th Cir. 2012).

Facial challenges to subject matter jurisdiction are based solely on the allegations in the complaint. When considering such challenges, the court must, as with a Rule 12(b)(6) motion, take the complaint's allegations as true. *Id." Carmichael v. Kellogg, Brown & Root Services, Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009); *see also Resnick v. KrunchCash, LLC,* 34 F.4th 1028, 1033 (11th Cir. 2022) (*de novo* review of district court order that it lacked subject matter jurisdiction accepts the complaint's allegations as true and construes them in the light most favorable to plaintiff).

## SUMMARY OF THE ARGUMENT

"In short, district courts should keep one thing in mind when *Rooker-Feldman* is raised: it will almost never apply." *Behr*, 8 F.4th at 1212.

Read in the light most favorable to the plaintiff, the Complaint alleges that two defendants engaged in a fraudulent scheme to subvert the neutrality of a state appellate court by corrupting two of its appellate judges, all in order to reap a financial reward to which the defendants were never entitled. The Complaint seeks only the remedy of damages for past wrongs committed and for disgorgement of the fraudulent ill-gotten financial benefits of this scheme. It does not attempt to overturn an injurious state-court judgment.

To the contrary, the Complaint alleges an independent fraud—an antecedent scheme by two defendants to manipulate the state courts to their benefit—by corrupting the judicial process and subverting the neutrality of the state tribunal. The Complaint does not seek appellate review and reversal of the state court judgment, as it does not need to do so. But the Complaint can properly allege facts that dispute the legitimacy of the result the defendants obtained in the matter litigated in state court without running afoul of *Rooker-Feldman*. *Behr*, 8 F.4th at 1210.

The district court misapprehended the law by fixating on the "inextricably intertwined" standard as the linchpin for ousting subject matter jurisdiction under the *Rooker-Feldman* doctrine. But that is the former way to apply the doctrine—a standard

that has been rejected because it broadly dismisses "all claims related in one way or another to state court litigation." *Behr*, 8 F.4th at 1212. The district court did not possess the *carte blanche* dismissal authority it presumed to possess, and its error was not harmless. Confined to its proper scope, *Rooker-Feldman* does not extinguish this claim seeking solely monetary damages for the acts of the defendants in conducting a scheme that violated Efron's rights before the courts of Puerto Rico and Florida.

There is an additional aggravating factor warranting reversal: the district court saw Efron's Complaint as seeking "his pound of flesh" and alleging a "story fit for adaptation into a telenovela." (29-1). These characterizations make clear that the district court disbelieved the allegations, rather than accepting them as true in resolving a facial attack on subject matter jurisdiction.

With this embedded mindset in hand, the district court could only have rejected the contention that there was extrinsic fraud committed by the defendants—after all, it never happened—and all that conceivably remained was to view the complaint as a direct attack on a legitimate state court judgment. This failure by the district court to apply the correct standard of review went hand-in-hand with its erroneous understanding of the law.

Issue II contends that the Court should recognize extrinsic fraud that corrupts state court proceedings as an exception to *Rooker-Feldman*, particularly in circumstances such as this where the Complaint exclusively seeks monetary

compensation for past wrongs in depriving the plaintiff of due process before a neutral state tribunal and the consequent denial of his civil rights and does not directly interfere with the state court judgment by seeking to reverse it.

That is to say, even if the allegations of the Complaint are perceived to transgress *Behr's* (and hence *Exxon Mobil's*) cabining of *Rooker-Feldman*, the vital interest in a legitimate state forum is an independent interest that vests subject matter jurisdiction in the federal court. Indeed, the majority of circuits, when considering the question of extrinsic fraud or judicial corruption, have reasoned that jurisdiction is not curtailed by *Rooker-Feldman*. But the Court need not agree that there is a discrete extrinsic fraud exception to reverse the dismissal order.

## ARGUMENT

I.   **The district court reversibly erred in holding that it lacked jurisdiction under the *Rooker-Feldman* doctrine: the Complaint sought only money damages against the Defendants for their intentional corruption of state-court proceedings that violated Plaintiff's fundamental right to due process and civil rights, and the Plaintiff sought no relief that would overturn the state-court judgment.**

   A.   **The district court's dismissal order misapprehended the law that should have been applied when it failed to consider the profound limitations recognized on the scope of the *Rooker-Feldman* doctrine in *Behr v. Campbell*, 8 F. 4th 1206 (11th Cir. 2021).**

The district court failed to apply the current limitations on the scope of the

*Rooker-Feldman* doctrine established in this circuit by *Behr v. Campbell*, 8 F.4th 1206

(11th Cir. 2021), for consideration of a facial attack on subject matter jurisdiction.[5] As a result, the district court erroneously dismissed Efron's Complaint.

*Rooker-Feldman* no longer prevents a federal district court from exercising subject matter jurisdiction when the allegations of a federal complaint are "claims presented or adjudicated by a state court" or "inextricably intertwined" with a state court judgment. *Behr v. Campbell*, 8 F.4th at 1209.[6]

*Rooker-Feldman* no longer prevents a district court from exercising subject matter jurisdiction when the allegations of a complaint "'require some consideration of a decision of a state court' if the plaintiff presents 'some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party.'" *Behr*, 8 F.4th at 1212 (quoting *Exxon Mobil*, 544 U.S. at 293.)

Such claims thus properly proceed in federal court when the complaint seeks damages for violations of constitutional rights during state-court proceedings, rather

---

[5] *Behr* confirms that the circuit's jurisprudence must "stay the course" directed by *Exxon-Mobil* to apply the doctrine by "asking whether the claims raised before the district court were 'brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Behr* 8 F. 4th at 1210 (quoting *Exxon Mobil*, 544 U.S. at 284).

[6] The district court apparently conducted independent research to identify case law that pivoted on whether the allegations of a federal complaint are "inextricably intertwined" with a state court judgment. In any event, no reference was made to this body of law until it was alluded to for the first time in the Defendants' reply to Efron's response to the motion to dismiss. (19-5 at footnote 5). Efron thus had no reason in his response to anticipate an issue that was not yet raised.

than a direct demand for rejection of the state court judgment: "Because *Rooker-Feldman* bars only claims that invite a district court's 'review and rejection' of a state court judgment, claims that seek only damages for constitutional violations of third parties—not relief from the judgment of the state court—are permitted." *Behr*, 8 F.4th at 1213 (citing *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397, 402 (6th Cir. 2020)) and *see Behr*, 8 F.4th at 1213 ("… the Behrs ask only for damages for this claim—they are not seeking to appeal or undo a state court judgment. So this claim, too, survives.").

*Behr* confirms that: "Only when a losing state court litigant calls on a district court to modify or 'overturn an injurious state-court judgment' should a claim be dismissed under *Rooker-Feldman*; district courts do not lose subject matter jurisdiction over a claim 'simply because a party attempts to litigate in federal court a matter previously litigated in state court." *Behr*, 8 F.4th at 1210 (quoting *Exxon Mobil*, 544 U.S. at 292-93).

The district court must focus "on the type of relief sought by the plaintiff," not on the relationship between federal claims and issues involved in the state court proceeding. *Behr*, 8 F.4th at 1214. Without running afoul of *Rooker-Feldman*, a party may litigate in federal court wrongs it believes to have been committed by state courts. *Id.* at 1211. Moreover, each claim must be separately considered in relation to jurisdiction. *Id.* at 1213.

*Behr* acknowledged that this "Circuit and others built *Rooker-Feldman* into a sweeping jurisdictional doctrine"—errantly so—that barred all claims that could have been brought before the state courts, were presented, and adjudicated by the state court, were inextricably intertwined with a state court judgment, or even "seemed sufficiently related to an earlier state court case." *Id.* at 1209.

*Rooker-Feldman* has been returned to its original moorings; it now applies: "Only when a losing state court litigant calls on a district court to modify or overturn an injurious state court judgment should a claim be dismissed under *Rooker-Feldman*." *Behr*, 8 F.4th at 1210 (internal quotation omitted). "In short, district courts should keep one thing in mind when *Rooker-Feldman* is raised: it will almost never apply." *Id.* at 1212.

**B.    As a direct consequence of its misunderstanding of the limited constraint *Rooker-Feldman* imposes on subject matter jurisdiction, the district court misapplied the law to dismiss all of Efron's claims for lack of subject matter jurisdiction.**

The district court's misapprehension of the law translated directly into its misapplication to the allegations presented in the complaint.

**1.  The district court did not apply the correct law.**

*First*, the district court misapprehended that *Rooker-Feldman* "extends not only to constitutional claims presented or adjudicated by a state court, but also to claims that are 'inextricably intertwined' with a state court judgment." (quoting *Siegel v. LePore*, 234 F.3d 1163, 1172 (11th Cir. 2000) (en banc)). (29-9).

Cases representative of this all-too-expansive and rejected application of the doctrine include *Goodman ex rel. Goodman v. Sipos*, 259 F.3d 1327, 1333 (11th Cir. 2001), and *Siegel v. LePore*, 234 F.3d 1163, 1172 (11th Cir. 2000) (en banc),[7] each of which preceded *Exxon Mobil* and each of which figure in the analysis set forth by the district court in its dismissal order. *See Behr*, 8 F.4th at 1209 and (29-9). Plainly, *Behr* recognizes that *Exxon Mobil* abrogates the previous law of this circuit.[8]

*Second*, the district court's dismissal order misapplied the law, concluding that: "After reviewing Plaintiff's claims in the contexts of his factual allegations, this Court finds that all the claims in the Complaint are inextricably intertwined with the validity— or, rather, the alleged invalidity—of the Aponte Opinions both of which were issued

---

[7] The en banc Court in *Siegel* did not apply *Rooker-Feldman* to find an absence of subject matter jurisdiction in a challenge to Florida's manual vote recount provision, even under the broader pre-*Exxon Mobil* standards. *Siegel*, 234 F.3d at 1172. *Behr* recognizes that *Siegel* misunderstood and inflated the doctrine's use, 8 F. 4th at 1209, and affirmatively concludes that "*Goodman* [*ex rel. Goodman v. Sipos*], 259 F.3d 1327, 1333 (11th Cir. 2001)] and other pre-*Exxon Mobil* cases no longer set the bar for which claims are or are not permissible under that doctrine." *Behr*, 8 F.4th at 1214.

[8] Under the prior-panel-precedent rule, "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *United States v. Jackson*, 55 F.4th 846, 853 (11th Cir. 2022) (quotation omitted). This rule includes a panel's consideration of an *en banc* holding of the Court that has been undermined to the point of abrogation by the Supreme Court. *See Del Castillo v. Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022) ("We are bound to follow a prior panel or en banc holding, except where that holding has been overruled or undermined to the point of abrogation by a subsequent en banc or Supreme Court decision.") (quoting *Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir. 1998)).

in connection with enforcing the finalized divorce decree." (29-9).

This was not harmless error. Rather, with this misunderstanding of *Rooker-Feldman* in hand as its jurisprudential cudgel, the district court rejected the narrowed boundaries for the doctrine set by *Behr* in favor of a virtually limitless judicial license to defeat jurisdiction. The district court (i) principally focused on the interrelationship of the federal claims to the litigation in the state courts; (ii) gave no weight to the exclusive damages remedy sought, (iii) or that the complaint sought no relief to vacate or reverse the state-court judgment; and (iv) similarly overlooked that damages could be awarded without nullifying the state court judgment.

As *Behr* recognized, it is far too tempting for district courts to routinely broaden the intended scope of *Rooker-Feldman* by errantly considering whether the issues raised by the complaint are "sufficiently related" to state court proceedings. 8 F.4th at 1209 (rejecting "inextricably intertwined" formulation that "effectively bar[s] federal court jurisdiction over all issues that seemed *sufficiently related* to an earlier state court case.") (emphasis supplied). Once unleashed, this interpretative journey is most likely to end in error because it (1) expands *Rooker-Feldman*'s statutory framework both exponentially and ambiguously into a boundless abstention doctrine, (2) depends on case-by-case judicial evaluation, and (3) pragmatically engrosses the district court in fact-based considerations whereas a facial attack on subject matter jurisdiction should accept the truth of the complaint's allegations. *Behr*, 8 F.4th at 1212.

2.    The district court did not accept the allegations of the Complaint as true: the court instead derided those allegations and suggested they were false—characterizing them as Efron's seeking his "pound of flesh" and comparing them to a fictionalized dramatic telenovela.

The district court errantly understood that the *Rooker-Feldman* doctrine authorized the court to focus on the allegations of the complaint, rather than the relief sought. From this error, the court procured license to adjudicate its view of the truthfulness of the allegations—a step the court should never have taken in response to a facial attack on subject matter jurisdiction. To be sure, the dismissal order reveals that the district court *disbelieved* the allegations of the complaint. Had it properly applied the law, it would never have taken this errant path.

Challenges to subject matter jurisdiction may be facial attacks or factual attacks. *Chevaldina v. Katz*, 21-12455, 2022 WL 2568066 at *2 (11th Cir. July 8, 2023). But "[w]hen a complaint is attacked facially, the court merely asks whether the plaintiff sufficiently alleged a basis for subject-matter jurisdiction on the face of the complaint itself, taking all the allegations in the complaint as true." *Id.*; *see also Lawrence*, 919 F.2d 1525, 1529-30 (11th Cir. 1990) (a facial attack limits "the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.").

Despite that legal mandate to accept the allegations of the complaint as true, the dismissal order transparently reveals that the district court treated the allegations as

false. Why else would the district court accuse Efron of "seeking his pound of flesh" and further describe the complaint's allegations to be "a story fit for adaptation into a telenovela." (29-1). The district court's statement that Efron "seeks what he believes to be his 'pound of flesh'," (identifying *The Merchant of Venice* as the source for this characterization) is an unequivocal comparison of Efron to Shakespeare's "Shylock."

For many, the phrase "pound of flesh" is a chilling reference to antisemitism. Unfortunately, Efron is no stranger to the use of this antisemitic slur, as it appears in a published decision of the Puerto Rico Court of Appeals to which he was a party against Candelario. That opinion openly discusses Shylock's demanding a pound of human flesh, which appears for the panel to have been an apt analogy to their description of Efron's success in business resulting from his efforts and ingenuity. *Efron v. Moral Candelario*, No. K AC 2001-4173, 2008 WL 5941795 at **16, 18 (Puerto Rico Ct. App., Oct. 29, 2008). Efron cannot say that the district court's reference to exacting a pound of flesh was based on his harboring antisemitic views against him; however, the use of this language should not be tolerated, as it casts a cloud on the neutrality of the tribunal.[9]

---

[9] To literary critics, readers (and non-readers) alike, *The Merchant of Venice* is an antisemitic trope that conveyed the worst view of Jewish people and played upon prejudices. In the Twentieth Century, the play was adopted as powerful theater in support of virulent antisemitic ideology.
*See* Exploratory Shakespeare, The Merchant of Venice as Nazi Propaganda, https://journeys.dartmouth.edu/exploratoryshakespeare/2015/07/14/the-merchant-of-venice-as-nazi-propaganda/.

Critically, Shylock is cast by Shakespeare as not seeking justice, rather he relentlessly pursues revenge for revenge's sake alone, which is relief unavailable before a court acting within the confines of the law. After all, Shylock would not settle the loan when offered repayment to cover Antonio's debt, declining because he preferred to exact the collateral, his desired "pound of flesh."[10] *The Merchant of Venice* paints Shylock in pursuit of revenge unhinged from necessity and his bargain is unenforceable to boot. Shylock's end is to suffer both the loss of his bargain and his birthright, due to his own incapacity to distinguish justice from injustice.

To any contemporary court's discredit in referring to the play, the Venetian

---

Whatever Shakespeare's original intention, the play has been weaponized on behalf of destructive prejudice. Judges have warned litigants not to disparage their opponents by quoting or analogizing the proceedings to the play precisely because it is laced with prejudicial characterizations throughout. *Bloch v. Frischholz*, 533 F.3d 562, 568 (7th Cir. 2008) (Wood, dissenting) ("This is hardly the reference someone should choose who is trying to show that the stand-off about Hallway Rule 1 was not *because of* the Blochs' religion, but rather *in spite of* it.") (emphasis original), *reversed in part*, 587 F.3d 771 (7th Cir. 2009) (en banc); *Tormenia v. LVNV Funding, Inc.*, Case No. 8:18-cv-2347-T-23TGW, 2019 WL 3429591 at *5 and n.3 (M.D. Fla. July 30, 2019) ("A word of caution: To avoid a deplorable insult a modern writer must consider carefully the circumstance in which 'pound of flesh,' which evokes a notorious stereotype, is displayed and consider carefully the person at whom the writer aims.").

[10] Shakespeare allows Shylock to express his own humanity in lockstep with Christians, in the well-known "Hath not a Jew eyes?" speech in Act III scene 1. But whether Shakespeare is suggesting there is justice in Shylock's cause or merely allowing Shylock to conveniently *justify* his bloodthirsty desire for revenge as an emotion shared by Jews and Gentiles alike, will continue to be the subject of debate. But we do know that Shylock was offered repayment of Antonio's loan in gold, but steadfastly insisted on taking his pound of flesh as collateral.

court of Shakespeare's tale is hardly a neutral and detached forum. By law, a Jew could not take a drop of Christian blood (though the opposite was likely not true), which is good reason for Portia—who herself is defrauding the court by disguising herself—to raise the legalistic bar to the loan enforcement Shylock was seeking—his pound of flesh—which would cause a drop (or more) of Antonio's blood to be shed. Nevertheless, Shylock's continuing vengeance is so great that he refuses Portia's request that a surgeon be present for the cutting.

By resurrecting the Venetian court cabined by its prejudices to condemn Shylock as an outsider intent on exacting revenge and injustice, the district court could be seen by any reasonable litigant to have set aside the federal tribunal's own neutrality. Indeed, there is powerful irony at work here: Efron's Complaint alleges that two state court judges set aside their neutrality.

Add to this the district court's statement that the Complaint's allegations are fit for a telenovela, commonly defined as an "outlandish plot ... recognizable to anyone familiar with the soap opera genre."[11] Thus, the district court makes known by this reference that the Complaint is also an unreasonably exaggerated accusation—it is not worthy of belief.

The district court's broad-brush characterizations of the Complaint as driven

---

[11] Olga Segura, "Why telenovelas are a powerful—and problematic—part of Latino culture" https://www.americamagazine.org/arts-culture/2018/04/06/why-telenovelas-are-powerful-and-problematic-part-latino-culture

by Shylock's vengeance and a telenovela's exaggerated and false melodrama cannot be squared with the court's obligation to accept all allegations of the complaint as true. Particularly where the allegations portray an extraction scheme victimizing the plaintiff, the district court's characterizations have flipped the script: Plaintiff Efron becomes victimizer not victim, and the Defendants become victims not victimizers.

The district court's error in all but concluding that the allegations were false, is by no means an exercise in splitting hairs. The Complaint alleged a conspiracy to extort Efron by subverting the neutrality of the state court. But for all practical purposes the district court construed the Complaint as an effort by Efron to extort his ex-wife and her lawyer. Having rejected the truth of the allegations describing the fraud—effectively concluding that it never happened—all that possibly remained was for the district court to consider the Complaint to be a direct attack on a legitimate state-court judgment.

The district court should instead have concerned itself in response to a facial attack only to "look and see" if the allegations supported a basis for subject matter jurisdiction. *Lawrence*, 919 F.2d at 1529-30. It transgressed that boundary, driven by its misapprehension that its legal responsibility was to compare the allegations of the Complaint to the underlying state-court proceedings. In performing that legally-errant task, the district court failed to treat all the allegations of the Complaint as true. *Chevaldina*, 2022 WL 25680 66 at *2.

3.   Viewing the allegations in their most favorable light, the Complaint readily states a basis for federal subject matter jurisdiction by demanding damages for the actions of the Defendants.

*Behr* minimizes the jurisdictional footprint of *Rooker-Feldman* to the determination of whether a federal complaint demands review and rejection of the underlying state court decision. *Behr* is not alone in this respect.

In *Arthur v. JP Morgan Chase Bank, NA*, 569 Fed. Appx. 669, 675-76 (11th Cir. 2014), this Court also recognized that a claim for fraud against participants in the underlying state court proceedings is not an attack on the state court judgment. There, the Court reasoned that the claims revived *Exxon Mobil's* refreshed restrictions on *Rooker-Feldman*, because "[plaintiffs] seek money damages for alleged criminal and fraudulent conduct in the *generation* of foreclosure-related documents." *Id.* at 675 (emphasis original).

There was not a direct attack seeking to nullify the state court judgment. The district court does not lack jurisdiction merely because a party attempts to litigate in federal court a matter previously litigated in state court." *Id.* (quoting *Exxon*, 544 U.S. at 293).

*Arthur* further recognizes that a federal complaint may relitigate issues raised in the state-court proceeding decided against the same plaintiff, bypassing rather than attacking the state-court judgment. *Arthur*, 569 Fed. Appx. at 675. Moreover, the injury sought to be rectified must only "flow at least in part from" a harm done outside

of the state court's judgment. *Id.*

That much is as plain here, as the scheme hatched by Defendants damaged Efron under the civil rights law apart from the state's appellate-court decision against him. Once a federal claim can be characterized even as in part independent from the state-court judgment, it is also immaterial that the fraud alleged might deny a conclusion the state court has reached. *Id.*, citing *Exxon Mobil*, 544 U.S. at 293. Nor is it determinative that a claim was or even could have been raised in the state court proceedings—*Rooker-Feldman* is not a collateral estoppel or res judicata defense. *See Behr*, 8 F.4th at 1210.

Efron's Complaint did not seek to reverse and nullify a state-court judgment, as is evident from review of the four counts of the Complaint.

In Count I—"Deprivation of Procedural Due Process Under 42 USC § 1983"— the Complaint sought an award for the *past* monetary damages the Aponte decision had caused: "As a direct and proximate consequence of the Defendants' actions, Efron has been injured in his business and property, causing Efron to suffer monetary damages in an amount not less than $7,000,000, said damages to be proven at the time of trial." (1- 17-¶74).

In Count II—"Conspiracy to Deny Civil Rights Under 42 USC § 1983"—the complaint demands like damages for past injuries and assumes that "Efron must litigate under the shadow of an illegally obtained ruling from Judge Aponte." (1-18-¶

82).

In Count III—"Civil Conspiracy"—the Complaint demands damages for past harm to Efron's business and property. (1-19-¶ 88).

In Count IV—"Unjust Enrichment"—Efron demands "return of the money received by Candelario and Cordero" that they should not be permitted "to retain." (1-19-¶¶ 91-92).

Thus, in all four counts, Efron's allegations specify a claim for damages independent of the standing Aponte decisions, based on the factual allegations that the two Defendants procured and then utilized state court judgments to obtain by means of fraud and misrepresentation not less than $7,000,000 that should be compensated for in damages or disgorgement.

Against all this, the district court narrowly focused on a lone allegation of the Complaint, alleging that Efron's due process rights will not be restored until abrogation of the Aponte decision, lest Defendants "will continue to have free reign to use" those orders against Efron. (1-16-¶66). But the operative counts of the Complaint do not rely upon the allegation found in paragraph 66, and the Complaint seeks no relief targeting the state-court judgment.

The operative counts seek monetary relief in a plain effort to obtain compensatory damages for past use of the Aponte decision and to deter its further use, but not specifically to reverse and overturn that state court judgment. Those

allegations establish subject matter jurisdiction. The allegation made in paragraph 66 is unnecessary to establishing federal jurisdiction and should not be the basis for dismissing for want of jurisdiction because it contains superfluous matter. *See Davis v. Ruby Foods*, 269 F.3d 818, 820 (7th Cir. 2001) (district court commits abuse of discretion to dismiss a complaint merely when superfluous matter is present); *see also Athens Newspapers, Inc. v. Jefferson Standard Life Ins. Co.*, 729 F.2d 1412, 1417 (11th Cir. 1984) ("Pleading facts not necessary to state a claim is not grounds for dismissal of a complaint."); *Bailey v. Janssen Pharm., Inc.*, 288 Fed. Appx. 597, 603 (11th Cir. 2008) (complaint that minimally suffices to put defendant on notice of legal theory of claim should not be dismissed because of superfluous matter).

Moreover, a federal question claim may be dismissed for lack of subject matter jurisdiction only when the alleged constitutional or statutory claim "is wholly insubstantial and frivolous," which applies to an "exceedingly narrow" category of claims lacking no plausible foundation. *Resnick*, 34 F.4th at 1034 (internal citations omitted). Here, "construed in the light most favorable to the plaintiff," *Maradiaga*, 679 F.3d at 1291, and in proper context with the relief sought by all four counts of the Complaint, it is exclusively through the recovery of monetary damages and disgorgement against the Defendants that the adverse effects of the state-court judgment will be negated, thereby restoring Efron's due process rights.

Further, as *Behr* instructs, each count of the Complaint must be considered by

the district court for its independent assertion of subject matter jurisdiction, something that the district court failed to do. *Behr*, 8 F.4th at 1213 ("*Rooker-Feldman*, being a narrow and limited doctrine, requires a more targeted approach. The question isn't whether the whole complaint seems to challenge a previous state court judgment, but whether resolution of each individual claim requires review and rejection of a state court judgment.").

There should be no doubt—and every favorable inference should be granted to Efron—that the purpose of this lawsuit is to hold two private actors accountable under the federal civil rights law in damages caused by their conspiratorial scheme, in which they engaged two appellate judges from Puerto Rico to corrupt judicial proceedings and violate Efron's constitutional due process rights with the successful outcome of exacting financial benefits.

The goal of this Complaint is to recover damages or disgorgement for past misdeeds—to undo the past effects of the state court opinion—not to review and reverse the Puerto Rico appellate court decision—which Efron need not do in order to prove damages for the violation of his civil rights. At this stage of the case, the district court should have gone no further than to look and see whether subject matter jurisdiction was properly alleged, viewed in the light most favorable to the plaintiff. *Lawrence*, 919

F.2d at 1529-30.[12]

In sum, Efron is not directly appealing or inviting review and rejection of the state court judgment. *See Exxon Mobil*, 544 U.S. at 284. He seeks compensation for the corrupt efforts of Defendants that have caused him monetary damages.

### 4. The district court's dismissal order is not supported by any post-*Exxon Mobil* decision of this Court.

None of the Court's post-*Exxon Mobil* decisions relied on by the district court support dismissal here.

In *Nicholson v. Shafe*, 558 F.3d 1266, 1272 (11th Cir. 2009), a panel of this circuit followed *Exxon Mobil* and effectively rejected the then-extant four-factor test for application of the doctrine set forth in prior case law. *Nicholson* otherwise addresses when a state court proceeding has achieved sufficient finality for purposes of applying *Rooker-Feldman*, an issue Efron has not raised. *Nicholson*, 558 F.3d at 1274-79.

In *Casale v. Tillman*, 558 F.3d 1258 (11th Cir. 2009), the federal claimant chose not to seek review of his federal claim in state court, arguing instead in federal court

---

[12] The Complaint unquestionably states sufficiently plausible factual matter on its face, which, accepted as true, state claims for civil rights violations, conspiracy to commit civil rights violations, and unjust enrichment. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Complaint's allegations allow much more than a reasonable inference that Defendants committed violations for which they are liable. *Id.* at 678. The district court did not determine that the allegations failed to surpass the plausibility standard when it ruled, erroneously, that it lacked subject matter jurisdiction to consider the case.

that the state court lacked jurisdiction to consider what amounted to a claim of federal preemption. *Id.* at 1261. This Court rejected Casale's restatement of his state-law claim and held, as well, that the issue was for direct appeal to the state court from the state trial court's decision. *Id.* Hence, *Casale* involved an overtly direct attack on a state-court judgment seeking to review and overturn the judgment of a state trial court that the would-be federal plaintiff chose not to seek review of before the state appellate court. *Id.* Efron has not sought to overturn the appellate judgment of the Puerto Rico court.

*Casale* also relied on the "inevitably intertwined" factor as a discrete doctrinal basis for finding a lack of federal subject matter jurisdiction, 558 F.3d at 1260, reasoning under the now-discarded rationale of *Goodman* that a federal claim is inextricably intertwined with a state court proceeding if it would "effectively nullify" the state court judgment. *Id.* Thus, in both the relief sought and its jurisprudential underpinnings, *Casale* does not support the district court's erroneous decision to dismiss Efron's Complaint.

The unpublished decision in *Ferrier v. Cascade Falls Condo. Ass'n, Inc.*, 820 Fed. Appx. 911 (11th Cir. 2020), is also distinguishable. It, too, amounted to a direct attack on a state-court foreclosure judgment—Ferrier requested review of various elements of the claim that would necessarily have been decided by the state court, including authenticity of the mortgage assignment, the loan servicer's interest in the

property, and specifically sought injunctive relief to prevent adverse claims to his title. *Id.* at 913. Obviously, these were issues necessarily subsumed by the foreclosure judgment, which Ferrier sought to undo by direct attack in federal court, along with a request for injunctive relief that would have negated the state court judgment. *Id.* at 914. Efron seeks no relief that would overturn the state's appellate-court decision. Rather, consistent with *Behr*, Efron pursues an independent claim against the two named defendants; he may contest the state court's conclusions but does not seek to overturn that decision.

### 5. The proper application of *Rooker-Feldman* post-*Behr* requires reinstatement of the Complaint.

Post-*Behr* decisions have been true to the narrowing of the doctrine's application. It is only where the complaint requests relief that directly attacks a state court judgment that *Rooker-Feldman* defeats jurisdiction.

In one recent case, the court distinguished between the injuries alleged resulting from the underlying foreclosure actions, not the state-court judgments that upheld those actions. *Mizell v. Wells Fargo Bank, N.A.*, No. 22-12119, 2023 WL 355067 at *2 (11th Cir. Jan. 23, 2023). The Court emphasized that the plaintiff did not invite review and rejection of the state court judgments: "The question isn't whether the whole complaint seems to challenge a previous state court judgment, but whether resolution of each individual claim requires review and rejection of a state court judgment." *Id.* at *2.

*Rooker-Feldman* applies when the state-court plaintiff demands in his prayer for relief a request that would literally invade the state court's judgment, such as a request for a stay of a foreclosure judgment, or that the district court declare state court acts to be null and void. *See Guy v. Florida*, No. 19-12852, 2022 WL 111278 at *1 (11th Cir. April 14, 2022); *Provitola v. Comer*, No. 21-10878, 2022 WL 823582 at *2 (11th Cir. March 18, 2022).

Efron's Complaint targets the misdeeds of the state court Defendants in committing violations of his civil rights. He does not directly attack the state court judgment in an effort to reverse it. *Rooker-Feldman* did not authorize dismissal.

II.   **The Court should recognize an exception to the *Rooker-Feldman* doctrine when a plaintiff alleges that extrinsic fraud has so corrupted state-court proceedings that the plaintiff was denied a neutral and detached state tribunal, and the plaintiff seeks only damages—not an overturning of the state-court judgment.**

A.   **No published decision of this circuit has decided whether to apply a fraud exception to *Rooker-Feldman*.**

Ample out-of-circuit authority supports Efron's argument that *Rooker-Feldman* does not foreclose his claim for damages under 42 U.S.C. § 1983 based specifically on the corruption of state court judicial proceedings; but this circuit has not yet determined whether an extrinsic fraud exception should prevent the application of *Rooker-Feldman*.

There is a significant distinction between (i) suing a defendant to set aside favorable state-court rulings, and (ii) suing a defendant because her fraudulent acts

extrinsic to the judicial process so invaded the state-court proceedings that the state-court rulings were the product of corruption. The first setting is plainly a direct attack on a state-court judgment. The second is as plainly a suit to rectify the consequences of the actions that resulted in rulings that denied the plaintiff due process and the right to be heard before a neutral and detached state tribunal. No published decision of this Court has approved or declined to adopt a fraud exception to the *Rooker-Feldman* doctrine, so there is no binding precedent in this circuit one way or the other.[13]

Efron contends that in cases where fraud is alleged—extrinsic to the issues decided by state court judges—there is significant support for federal subject matter jurisdiction because claims, such as those presented by Efron, do not seek to nullify the state court judgment when they seek damages for the misconduct of parties to the state court proceedings. Such an exception is entirely consistent with *Behr's* instruction that the *Rooker-Feldman* doctrine must be limited to claims that directly seek relief that would overturn a state court judgment.

And this Court has previously stated in an unpublished decision that the "*Rooker–Feldman* doctrine does not bar *independent claims* that ... state court judgments were procured by certain Defendants through fraud, misrepresentation,

---

[13] Unpublished decisions are non-binding authority on subsequent panels deciding cases. *Ray v. McCullogh Payne & Haan, LLC*, 838 F.3d 1107, 1109 (11th Cir. 2016). They are "persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Constr., Inc.*, 487 F.3d 1340, 1345 n. 7 (11th Cir. 2007).

or other improper means." *Kohler v. Garlets*, 578 Fed. Appx. 862, 864 (11th Cir. 2014) (quoting *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006)) (emphasis included).

In *Kohler*, suit was filed against attorneys who had opposed the federal plaintiff in state court and their mortgagor client for relief under § 1983. Although the judgment against Kohler was affirmed, this Court found merit in the jurisdictional argument that there was an independent claim for damages against Garlets and her attorneys "based on alleged misconduct during the state foreclosure proceedings," where those defendants effectively knew of certain defects in the mortgage documents but nevertheless sought foreclosure for their personal gain. *Id.* at 864. Said *Kohler*: "Because a challenge to the defendants' conduct in state proceedings does not necessarily seek appellate review and reversal of the state court judgment, the district court erred in ruling that such a claim was barred by the *Rooker-Feldman* doctrine." *Id.*

This is exactly what Efron alleged in his Complaint, seeking to recover damages from Defendants for conspiring with a Puerto Rico judge to procure a judgment through improper means. This Complaint does not seek to reverse and nullify the court judgments rendered in Puerto Rico.

It would be odd indeed were the law to reject federal jurisdiction on the basis that state-court judges had actively participated in a scheme by state-court litigants that

36

subverted the plaintiff's civil rights. Certainly, that logic would be counter-intuitive. After all, Candelario's scheme was all the worse for drawing in two judges to ensure its success—the intentional participation by two judges in that scheme should not destroy federal jurisdiction; whereas the failure to coopt them into the scheme would allow for the exercise of federal jurisdiction.

Although the district court found that this Court expressly rejected a "fraud exception" to *Rooker-Feldman* (29-10-11), referencing this Court's unpublished decision in *Ferrier*, that characterization stretches *Ferrier* beyond its limits as a nonbinding, unpublished decision, which, we note, was decided before *Behr's* recognition that *Exxon Mobil* requires a thorough reassessment and curtailing of the doctrine's potency in negating jurisdiction.

We previously distinguished *Ferrier* as a case, unlike Efron's, where the plaintiff literally sought relief demanding that the district court enjoin the continuing efficacy of the state court's foreclosure judgment. *Ferrier*, 820 F. App'x at 913 (11th Cir. 2020). Moreover, all of the plaintiff's allegations in *Ferrier* involved an opposing party who was accused of intrinsic fraud on the state court – not corruption by that court or its judges. Thus, *Ferrier* negated a fraud exception under a materially different set of facts—not in the context of a detailed claim of corrupt conduct by state judicial officers.

Efron's Complaint seeks relief that arises from the distinct misconduct of the two defendants who successfully engaged two judges from the appellate court of

Puerto Rico to engage in the conspiratorial scheme with the defendants. The allegation that two state-court judges were involved in this wrongdoing by conspiring with the Defendants is proof of the success of the scheme—not that this federal suit seeks to nullify the state court *Aponte* decisions.

> **B.** **A majority of the federal circuits recognize that a plaintiff has federal subject matter jurisdiction to sue for damages based on the independent wrongdoing of participants in state court proceeding where the plaintiff does not seek to overturn the state court judgment.**

The Third Circuit found *Rooker-Feldman* inapplicable in *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 162 (3d Cir. 2010). There, the court examined Great Western's claim that "pursuant to [a] conspiracy, the court decisions were predetermined prior to the beginning of the hearing [and] as a result Great Western was purportedly forced to litigate in a rigged system ... in violation of its constitutional rights." *Id.* at 171.

That claim was not viewed to be one stemming from an injury caused by a state court judgment or seeking review and rejection of a state court judgment. *Id.* Rather, it was a claim for relief involving the independent right to an impartial tribunal. *Id.* at 172. The alleged conspiracy was intended "to reach a predetermined outcome ... to violate [plaintiff's] constitutional rights, independently of the subsequent state-court decisions." *Id.*

The Ninth Circuit has similarly distinguished between a claim asserting a legal wrong resulting from an allegedly erroneous decision by a state court from which the

plaintiff seeks direct relief from the state court judgment, as opposed to a claim based on "an allegedly illegal act or omission by an adverse party." *Kougasian v. TMSL, Inc.,* 359 F.3d 1136, 1140 (9th Cir. 2004).

The Ninth Circuit considered the latter claim to rest on fraud extrinsic to the state court proceeding, preventing the party from presenting her claim in court. *Id.* This is an allegation of wrong by the party, not the court: "Extrinsic fraud on a court is, by definition, not an error by that court. It is, rather, a wrongful act committed by the party or parties who engaged in the fraud." *Id.* at 1141. *Rooker-Feldman* did not pose an obstacle to the federal court's acquiring jurisdiction over these claims. *Id.*

The Fifth Circuit has also rejected *Rooker-Feldman's* application to claims that allege injuries resulting from the actions of private actors in misleading a state court. *See Truong v. Bank of Am., N.A.,* 717 F.3d 377, 383 (5th Cir. 2013) (*Rooker-Feldman* doctrine did not bar challenge to foreclosure action when "the damages [the Appellant] requested were for injuries caused by the bank's actions, not injuries resulting from the foreclosure judgment.").

*Truong* cites approvingly to *Great Western* and to the Sixth Circuit's decision in *McCormick,* 393 F.3d at 392-96, that the doctrine "does not bar claims that state-court opponents committed fraud and abuse of process, but does bar a claim that an adverse receivership order was illegal." *Truong,* 717 F.3d at 383.

According to *McCormick,* it "is the source of the injury the plaintiff alleges in

the federal complaint" that is decisive—if the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine would prevent the district court from asserting jurisdiction. If there is some other source of injury, such as a third-party's actions, then the plaintiff asserts an independent claim." *McCormick*, 393 F.3d at 393.

### C. The Seventh Circuit reverses course and rejects its previously confirmed "corruption exception" to *Rooker-Feldman*.

The Seventh Circuit had until recently aligned with the Third, Fifth, Sixth and Ninth Circuits in a series of decisions recognizing the existence of a "corruption exception" to *Rooker-Feldman. See Hadzi-Tanovic v. Johnson*, 62 F.4th 394, 402-5 (7th Cir. 2023). That corruption exception effectively authorized federal subject matter jurisdiction in circumstances in which the allegation was made that the neutrality of the tribunal has been usurped by misconduct by parties and judges. *Id.*

In *Hadzi-Tanovic*, a panel of the Seventh Circuit overruled several past panel decisions and that circuit's "corruption exception."[14] 62 F. 4th at 404-5. Particularly concerning to the panel was the danger that a corruption exception could become the rule to plead around the doctrine's jurisdictional bar, despite the fact that the panel

---

[14] A Seventh Circuit panel may overrule another panel if there is "a compelling reason" to do so. *Wilson v. Cook City*, 937 F.3d 1028, 1035 (7th Cir. 2019). The clerk then circulates the opinion to all active judges to determine if the majority will vote to hear the case en banc, pursuant to Seventh Circuit Rule 40(e).

was "not unsympathetic to the argument, expressed in *Nesses*,[15] that our holding here means that 'there would be no federal remedy for a violation of federal rights whenever the violator so far succeed[s] in corrupting the state judicial process as to obtain a favorable judgment." *Id.* at 405. Two members of the court dissented from denial of rehearing en banc. *See Hadzi-Tanovic*, 62 F.4th at 408 (Kirsch, Circuit Judge, dissenting from denial of rehearing en banc).

The dissent's dual criticism is precisely that made by this Court's *Behr* decision in preventing expansion of the doctrine from its statutory moorings. *First*, a plaintiff is not barred by *Rooker-Feldman* when complaining of an injury caused at least in part by the independent conduct of parties and not by the state court judgment. *Second*, a plaintiff is not barred by *Rooker-Feldman* because it asks the federal court to disagree with a state-court judgment. It is only when the plaintiff further asks that the federal district court overturn or undo the state court judgment that *Rooker-Feldman* applies. *Hadzi-Tanovic*, 62 F.4th at 410-11 (Kirsch, Circuit Judge, dissenting from denial of rehearing en banc).

In sum, the state court judgment is not disturbed if the federal plaintiff obtains damages for the unlawful conduct that resulted in the improvidently issued state-court judgment. *Hadzi-Tanovic*, 62 F.4th at 412 (Kirsch, Circuit Judge, dissenting from

---

[15] *Nesses v. Shepard*, 68 F.3d 1003 (7th Cir. 1995), *overruled by Hadzi-Tanovic*, 62 F.4th at 404.

denial of rehearing en banc). Among the nine circuits that the dissent contends agree with its reasoning from which the panel opinion diverges is this Court's decision in *Behr*. *Id.* at 62 F.4th at 413-14; *see also MSK Eyes Ltd. v. Wells Fargo Bank,Nat. Ass'n*, 546 F.3d 533, 539 (8th Cir. 2008) (*Rooker-Feldman* did not prevent jurisdiction because suit alleging fraudulent activity in seeking and obtaining the judgment does not seek review, rejection or to overturn the judgment, "[a]lthough Appellants complain of injuries caused by the state court judgment.").

By focusing on the relationship between the state court proceedings and the federal claims, rather than the relief sought, the *Hadzi-Tanovic* panel indulges the same confusion that would once again increase the potency of *Rooker-Feldman* beyond the bounds circumscribed by *Exxon Mobil*. Moreover, the *Hadzi-Tanovic* panel decision awkwardly resolves the concern that arises when a state-court judge is implicated by the allegations of conspiracy. The decision concludes that it "does not speak to whether or under what circumstances allegations of fraud by state court opponents (acting without the participation of the state court) escape *Rooker-Feldman*." *Hadzi-Tanovic*, 62 F.4th at 407.

That resolution of the competing interests defies legal logic. It makes no sense that corrupt actors can be held to pay damages for their misconduct only when they choose not to enlist state-court judges in their scheme, but cannot be brought to financial justice if they do successfully enlist state-court judges. Such a distinction is

also far afield from the statutory foundation for *Rooker-Feldman*.

There is also a pragmatic difference between the substance of a fraud and corruption scheme as pled by Efron and the allegations by the plaintiff in *Hadzi-Tanovic*. In the latter case, all of the accusations regarding judicial corruption can be fairly viewed as intrinsic court processes. There, the plaintiff contended that the judge's rulings were outrageous, hearings on her motions were delayed whereas other parties received prompt hearings, and that the judge had *ex parte* communications with the child's guardian whose testimony was "unrealistic, unbelievable and clearly false." *Hadzi-Tanovic*, 62 F.4th at 401.

Efron's factual allegations include a host of contentions involving (i) acts outside the courthouse, and (ii) separate trial level and criminal proceedings. (E.g., 1-12-¶¶ 46-51). These allegations detail conspiratorial events extrinsic to the judicial function of Aponte as an appellate judge.

The great weight of sound authority from other circuits recognizes that a fraud extrinsic to the state-court judgment is an independent basis for federal subject matter jurisdiction. This Court, consistent with *Behr*, should adopt that majority view.

## CONCLUSION

The Court should reverse the dismissal order and instruct the district court to assume subject matter jurisdiction over the case.

Respectfully submitted,

*/s/ Charles M. Auslander*
Charles M. Auslander

Charles M. Auslander
John G. Crabtree
Brian C. Tackenberg
Crabtree & Auslander
240 Crandon Boulevard, Suite 101
Key Biscayne, Florida 33149
Tel: (305) 361-3770
jcrabtree@crabtreelaw.com
causlander@crabtreelaw.com
btackenberg@crabtreelaw.com
*Co-Counsel for Appellant David Efron*

Benedict P. Kuehne
Kuehne Davis Law, P.A.
Miami Tower, Suite 3105
100 S.E. 2 Street
Miami, Florida 33131-2154
Tel: 305-789-5989
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com
*Co-Counsel for Appellant David Efron*

44

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 28.1(c)(2) and 28.1(e)(2)(B)(i), as the brief contains 10,662 words, excluding those parts exempted by 11th Circuit Rule 32-4.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Baskerville.

Respectfully submitted,

*/s/ Charles M. Auslander*
Charles M. Auslander
Florida Bar No. 349747
Crabtree & Auslander
240 Crandon Boulevard, Suite 101
Key Biscayne, Florida 33149
Tel (305) 361-3770
causlander@crabtreelaw.com

*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel or parties of record.

Respectfully submitted,

*/s/ Charles M. Auslander*
Charles M. Auslander